| | |
|---|---|
| GIGI MICHELLE LONGORIA, NOAH JENSEN and JOSEPH RAMIREZ on behalf of his minor child, J.R., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>XSOLIS, INC.,<br><br>Defendant. | Case No.<br><br><br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Gigi Michelle Longoria, Noah Jensen and Joseph Ramirez, on behalf of his minor child, J.R., ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Xsolis, Inc. ("Xsolis" or "Defendant") to obtain damages, restitution, and injunctive relief from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and facts that are a matter of public record.

## NATURE OF THE ACTION

1.      This class action arises out of Defendant Xsolis's failure to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiffs' and Class members' (defined below) sensitive information that it had acquired and stored for its business purposes.

2.      Entities that provide services and handle patients' sensitive personal information owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of patients' Private Information to unauthorized persons, especially hackers with nefarious intentions, will result in harm to the affected individuals, including, but not limited to,

the invasion of their private financial and health-related matters.

3.      Defendant had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on affirmative representations to Plaintiffs and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

4.      According to its website, Defendant Xsolis provides "[a]ward-winning healthcare technology and services,"[1] that "[d]rive[s] efficiency and impact with Dragonfly by Xsolis. Streamline medical necessity decisions, discharge planning, and payer-provider collaboration while actively preventing denials."[2]

5.      According to the cybernews sources, Xsolis exposed the personally identifiable information ("PII")[3] and protected health information ("PHI")[4] (collectively, the "Private Information") belonging to Plaintiffs and potentially 1.4 million other Class members. On January 22, 2026, a known cybercriminal gang, claimed responsibility for a cyberattack against Xsolis, during which the cybercriminals were able to access and exfiltrate the Private Information of potentially 1.4 million patients that Xsolis managed (the "Data Breach").[5] The Data Breach is the

---

[1] https://www.xsolis.com/ (last visited June 29, 2026).
[2] *Id.*
[3] Personally identifiable information ("PII") generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on its face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers, etc.).
[4] Protected health information ("PHI") is a category of information that refers to an individual's medical records and history, which is protected under the Health Insurance Portability and Accountability Act. Inter alia, PHI includes test results, procedure descriptions, diagnoses, personal or family medical histories and data points applied to a set of demographic information for a particular patient.
[5] https://www.hipaajournal.com/xsolis-data-breach/ (last visited June 29, 2026). *See also* https://cybernews.com/news/xsolis-humana-healthcare-data-breach-1-4-million-patients/ (last visited June 29, 2026).

result of hacking.[6]

6. Due to Defendant's data security failures which resulted in the Data Breach, cybercriminals were able to target Defendant's computer systems and exfiltrate Plaintiffs' and Class members' highly sensitive Private Information. As a result of this Data Breach, Plaintiffs' and Class Members' Private Information was compromised and stolen and remains in the hands of those cybercriminals.

7. Despite apparently learning of the Data Breach on or about January 22, 2026, and determining that Private Information was involved in the breach,[7] Defendant waited nearly six months to provide notice, or any information concerning the Breach to those affected, including Plaintiffs and Class members.[8]

8. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Plaintiffs' and Class members' Private Information with which it was entrusted for either treatment or employment or both.

9. Plaintiffs bring this class action lawsuit on behalf of themselves and all other similarly situated persons to address Defendant's inadequate safeguarding of Class members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class members that their information had been subject to the unauthorized access of an unknown third party and failing to include in that belated and inadequate notice precisely what specific types of information were accessed and taken by cybercriminals.

10. Defendant maintained the Private Information in a reckless manner. In particular,

---

[6] *Id.*
[7] *Id. at* n.5 *supra.*
[8] https://www.xsolisdataincident.com/ (last visited June 29, 2026). *See also*, Data Breach Notice, attached as Exhibit "A."

the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that network in a dangerous condition.

11. Defendant disregarded Plaintiffs' and Class members' rights by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class members with prompt and full notice of the Data Breach.

12. In addition, Defendant failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its computer network and systems, it would have discovered the massive intrusion sooner rather than allowing cybercriminals unimpeded access to Plaintiffs' and Class members' Private Information.

13. Plaintiffs' and Class members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

14. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including: opening new financial accounts in Class members' names, taking out loans in Class members' names, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' information, filing false

4

medical claims using Class members' information, obtaining driver's licenses in Class members' names but with another person's photograph, and giving false information to police during an arrest.

15. As a result of the Data Breach, Plaintiffs and Class members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

16. Plaintiffs and Class members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all other similarly situated individuals whose Private Information was accessed during the Data Breach.

18. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring funded by Defendant, and declaratory relief.

## **PARTIES**

19. Plaintiff Gigi Michelle Longoria is and at all times mentioned herein was an individual citizen of the State of Arizona, and is a Data Breach victim.

20. Plaintiff Noah Jensen is and at all times mentioned herein was an individual citizen of the State of Arizona, and is a Data Breach victim.

21. Plaintiff Joseph Ramirez, on behalf of his minor child, J.R., is and at all times mentioned herein was an individual citizen of the State of Arizona, and is a Data Breach victim.

5

22. Defendant Xsolis, Inc. is a Delaware corporation registered to conduct business in this state, with its principal place of business located at 4031 Aspen Grove Dr Ste 500, Franklin, Tennessee, 37067.

23. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged here are currently unknown to Plaintiff.

24. Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of the responsible parties when their identities become known.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100 and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d) (2) (A). Defendant has its principal place of business located in this District.

26. This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintains its principal place of business in this District.

27. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

28. Xsolis offers "delivers insight-driven workflows that reduce friction, protect

revenue, and align providers and payers by turning fragmented clinical data into consistent, evidence-based decisions across admission, continued stay, discharge, and medical necessity and reimbursement."[9]

29. In the ordinary course of receiving Defendant's services and products, each patient must provide (and Plaintiffs did provide) Defendant with sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;

- Date of birth;

- Social Security number;

- driver's license numbers;

- payment and financial account information;

- health insurance information; and

- medical information.

30. Defendant also creates and stores medical records and other protected health information for its patients, including records of treatments and diagnoses. In addition to providing treatment, Defendant utilizes Private Information it collects for "updates, registering for events, subscribing to newsletters, ordering products or services, or responding to surveys, offers, promotions, and other communications. We also may collect personal information about you from your use of our products and services or through our partners and other publicly and commercially available sources."[10]

31. Regarding its Data Security, Defendant represents that it "implement[s] a variety of

---

[9] *Id.*, n.1, *supra*.
[10] https://www.xsolis.com/privacy-policy/ (last visited June 29, 2026).

security measures when you enter, submit, or access your information to maintain the safety of your personal information. Your personal information is contained behind secured networks and is only accessible by a limited number of persons who have special access rights to such systems and are required to keep the information confidential."[11]

32.     Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").

33.     Yet, through its failure to properly secure Plaintiffs' and Class members' Private Information, Defendant failed to meet its own promises of patient privacy.

34.     Thus, the potential for improper disclosure of Plaintiffs' and Class members' PII and PHI was a known risk to Defendant and Defendant was on notice that failing to take steps necessary to secure the PII and PHI from those risks left its network in a dangerous condition.

35.     Defendant and its employees failed to properly monitor the computer network and systems that housed the PII and PHI. Had Defendant properly monitored the network, it would have prevented this breach altogether.

### *The Data Breach*

36.     A data breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

37.     On or about January 22, 2026, Xsolis experienced a security incident disrupting access to its systems. As above, the breach occurred when Xsolis became aware of unauthorized activity impacting a limited portion of the Xsolis environment resulting from a targeted phishing

---

[11] *Id.*

attack on January 20, 2026.[12] Consequently, a known cybercriminal gang was able to access and exfiltrate Plaintiffs' and Class members' Private Information along with potentially 1.4 million patients that Xsolis managed.[13] It is clear that a known ransomware group stole massive amounts of data from Xsolis's information network.[14]

38. On information and belief, Plaintiffs' and Class members' stolen Private Information has now been published by cybercriminals to the Dark Web as that is the modus operandi of ransomware attackers.[15]

39. As the Harvard Business Review notes, "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[16]

40. Despite being aware of the hacking incident, Xsolis delayed nearly six months to notify Plaintiffs and the Class. Nor has Defendant informed Plaintiffs regarding the steps it is taking to protect the Private Information going forward. Nor has Defendant provided any public information on the ransom demand or payment.

41. In January 2023, now three years before the attack, HHS created a presentation specifically for healthcare providers and IT departments, warning entities like Defendant of the

---

[12] *Id.,* nn.5,8, *supra.*
[13] *Id.* n.5, *supra.*
[14] *Id.*
[15] https://www.paloaltonetworks.com/cyberpedia/what-is-multi-extortion-ransomware (Typically, in a ransomware attack, the criminal actor will not only encrypt the victim's system and block access until a ransom is paid but also exfiltrate data and threaten to release it to the dark web if a ransom is not paid. This scheme is known as a double-extortion attack. This scheme is used because many "organizations overcome the threat of file encryption with a simple up-to-date backup system.").
[16] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

9

severe threats posed by cybercriminal groups.[17] Within the healthcare industry, the risk of a cyberattack is well-known and preventable with adequate security systems in place.

42. The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures to protect its patients' Private Information. Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

43. Defendant had obligations created by HIPAA, FTCA, contract, industry standards, common law, and representations made to Plaintiffs and Class members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

44. Plaintiffs and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

### *The Data Breach was a Foreseeable Risk of which Defendant was on Notice.*

45. It is well known that PII and PHI, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including Defendant, are well-aware of the risk of being targeted by cybercriminals.

46. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

47. According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations

---

[17] https://www.hhs.gov/sites/default/files/royal-blackcat-ransomware-tlpclear.pdf (last visited June 29, 2026).

and the loss of critical information and data."[18] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[19]

48. Individuals place a high value on the privacy of their PII and PHI. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

49. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[20]

50. Individuals, like Plaintiffs and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing one's DNA for hacker's purposes.

51. Data Breach victims suffer long-term consequences when their Social Security

---

[18] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited June 29, 2026).
[19] *Id.*
[20] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited June 29, 2026).

numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiffs and Class members cannot obtain new numbers unless they become a victim of Social Security number misuse.

52. The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[21]

53. In 2021, there was a 15.1% increase in cyberattacks and data breaches from 2020. In a poll of security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable cases will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[22]

54. That trend continues. According to the Identity Theft Resource Center (ITRC), there was a new record for the number of data compromises tracked in a year, up four percentage points in 2025 (3,322) from the previous all-time high in 2023 (3,202).[23] Significantly, according the ITRC report, 88 percent of people who received a data breach notice experienced at least one negative consequence after a breach, including an increase in "phishing" or scam attempts (40

---

[21] https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited June 29, 2026).

[22] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last visited June 29, 2026).

[23] https://www.idtheftcenter.org/post/2025-annual-data-breach-report-record-number-compromises/#:~:text=Consumer%20Attitudes%20About%20Data%20Breach,phishing%20attempts%20after%20a%20breach (last visited June 29, 2026).

percent), an increase in spam emails or robocalls (49 percent) and attempted takeover of an existing account (40 percent).[24]

55. Identity crimes are life-altering events. According the ITRC research, 35 percent of victims report losses exceeding $10,000, and 11 percent report losses greater than $1 million.[25]

56. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII and PHI private and secure, Defendant failed to take appropriate steps to protect Plaintiffs' and the proposed Class' Private Information from being compromised.

### *Data Breaches are Rampant in Healthcare.*

57. Defendant's data security obligations were particularly important given the substantial increase in data breaches in the healthcare industry preceding the date of the breach.

58. According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[26]

59. Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily

---

[24] *Id.*
[25] https://www.idtheftcenter.org/publication/itrc-2025-annual-report/ at 9 (last visited June 29, 2026).
[26] https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last visited June 29, 2026).

monetized."[27]

60. The HIPAA Journal article goes on to explain that patient records, like those stolen from Defendant, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[28]

61. According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[29]

62. The significant increase in attacks in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant.

***Defendant Failed to Comply with FTC Guidelines.***

63. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

64. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly

---

[27] *Id.*
[28] *Id.*
[29] https://www.ahu.edu/blog/data-security-in-healthcare (last visited June 29, 2026).

14

dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[30] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[31]

65.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

66.     The FTC has brought enforcement actions against businesses, like that of Defendant, for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67.     These FTC enforcement actions include actions against healthcare providers like Defendant.

68.     Defendant's failure to employ reasonable and appropriate measures to protect

---

[30] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited June 29, 2026).
[31] *Id*.

15

against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

69.     Defendant was at all times fully aware of its obligation to protect the PII and PHI of its patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

*Defendant Failed to Comply with Industry Standards.*

70.     As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

71.     Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data, and; limiting which employees can access sensitive data.

72.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

73.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for

16

Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

74. These frameworks are existing and applicable industry standards in the healthcare industry, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

### *Defendant's Conduct Violates HIPAA.*

75. HIPAA requires covered entities such as Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information (PHI).

76. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

77. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

78. A Data Breach, such as the one Defendant experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40.

79. Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate its failure to comply with safeguards mandated by HIPAA.

***Defendant Breached its Obligations to Plaintiffs and Class.***

80. Defendant breached its obligations to Plaintiffs and Class members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its patients' data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect patients' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;

e. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports

18

in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

l. Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding data security, as well as PHI, as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

m. Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

81. As the result of maintaining its computer systems in manner that required security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class members' Private Information.

82. Accordingly, as outlined below, Plaintiffs and Class members now face an increased risk of fraud and identity theft.

***Data Breaches Put Consumers at an Increased Risk Of Fraud and Identity Theft***

83. Data Breaches such as the one Plaintiffs and Class members experienced cause significant disruption to the overall daily lives of victims affected by the attack.

84. In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[32] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiffs and Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

85. The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

86. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[33]

87. Identity thieves use stolen personal information such as Social Security numbers

---

[32] https://www.gao.gov/assets/gao-19-230.pdf (last visited June 29, 2026).
[33] *See* https://www.identitytheft.gov/Steps (last visited June 29, 2026).

for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

88. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

89. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

90. There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiffs and Class members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class members must vigilantly monitor their financial and medical accounts for many years to come.

91. Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[34] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[35] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an

---

[34] *Identity Theft and Your Social Security Number*, Social Security Administration, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited June 29, 2026).
[35] *Id.* at 4.

individual's authentic tax return is rejected.

92.     Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[36]

93.     This data, as one would expect, commands a much higher price on the black market. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[37] Experian reports that a stolen credit or debit card number can sell for $5 to $240 on the dark web.[38] Moreover, the types of information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

94.     In recent years, the medical and financial industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

---

[36] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 29, 2026 ).
[37] https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited June 29, 2026).
[38] https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited June 29, 2026).

95. Plaintiff Gigi Michelle Longoria became aware on or about June 12, 2026 that her Private Information was included as part of the Data Breach.

96. As a condition of obtaining medical services, Plaintiff Longoria was required to provide Defendant with her Private Information, including her name, Social Security number, date of birth, contact information, medical history and insurance and payment information. Thus, Plaintiff Longoria's Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, Plaintiff Longoria's information was among the data exfiltrated in the Data Breach.

97. Plaintiff Longoria reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Longoria would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

98. As a result, Plaintiff Longoria spent time, and continues to spend time, dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, self-monitoring her accounts and seeking legal counsel regarding her options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff Longoria has lost at least two (2) hours.

99. Plaintiff Longoria suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Longoria entrusted to Defendant, which was compromised in and as a result of the Data Breach. Future

23

identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

100. Plaintiff Longoria is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

101. Shortly after the Data Breach, Plaintiff Longoria began receiving an excessive number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, she believes that spam is related to her stolen Private Information.

102. Plaintiff Longoria suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Longoria's Private Information.

103. Plaintiff Longoria suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from her Private Information being placed in the hands of unauthorized third parties/criminals. Plaintiff Longoria has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Noah Jensen's Experiences*

104. Plaintiff Noah Jensen became aware on or about June 12, 2026 that his Private Information was included as part of the Data Breach.

105. As a condition of obtaining medical services, Plaintiff Jensen was required to provide Defendant with his Private Information, including his name, Social Security number, date

of birth, contact information, medical history and insurance and payment information. Thus, Plaintiff Jensen's Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, Plaintiff Jensen's information was among the data exfiltrated in the Data Breach.

106. Plaintiff Jensen reasonably understood and expected that Defendant would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Jensen would not have allowed Defendant, or anyone in Defendant's position, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

107. As a result, Plaintiff Jensen spent time, and continues to spend time, dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, self-monitoring his accounts and seeking legal counsel regarding his options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff Jensen has lost at least two (2) hours.

108. Plaintiff Jensen suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff Jensen entrusted to Defendant, which was compromised in and as a result of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

109. Plaintiff Jensen began receiving an excessive number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, he believes that spam is related to his stolen Private Information.

110. Plaintiff Jensen suffered lost time, annoyance, interference and inconvenience as a

result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Jensen's Private Information.

111. Plaintiff Jensen suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from his Private Information being placed in the hands of unauthorized third parties. Plaintiff Jensen has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

112. Plaintiff Jensen is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

### *Plaintiff Joseph Ramirez, on behalf of his minor child, J.R.'s Experiences*

113. On or about June 12, 2026, Plaintiff Joseph Ramirez, on behalf of his minor child, J.R., became aware that J.R.'s Private Information was included as part of the Data Breach.

114. As a condition of obtaining medical services, Plaintiff Ramirez was required to provide Defendant with J.R.'s Private Information, including J.R.'s name, Social Security number, date of birth, contact information, medical history and insurance and payment information. Thus, J.R.'s Private Information was within Defendant's possession and control at the time of the Data Breach. As a result, J.R.'s information was among the data exfiltrated in the Data Breach.

115. Plaintiff Ramirez reasonably understood and expected that Defendant would safeguard J.R.'s Private Information and timely and adequately notify him in the event of a data breach. Plaintiff Ramirez would not have allowed Defendant, or anyone in Defendant's position, to maintain J.R.'s Private Information if he believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

26

116.     As a result, Plaintiff Ramirez spent time, and continues to spend time, dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, monitoring J.R.'s accounts and seeking legal counsel regarding his options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured. In total, Plaintiff Ramirez has lost at least two (2) hours.

117.     Plaintiff Ramirez suffered actual injury in the form of damages to and diminution in the value of J.R.'s Private Information—a form of intangible property that Plaintiff Ramirez entrusted to Defendant, which was compromised in and as a result of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

118.     Shortly after the Data Breach, Plaintiff Ramirez began receiving an excessive number of spam calls and texts. This spam is a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, he believes that spam is related to J.R.'s stolen Private Information.

119.     Plaintiff Ramirez suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling J.R.'s Private Information.

120.     Plaintiff Ramirez suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from J.R's Private Information being placed in the hands of unauthorized third parties/criminals. Plaintiff Ramirez has a continuing interest in ensuring that J.R.'s Private Information, which, upon information and

belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

121. Plaintiff Ramirez is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

*Plaintiffs' And Class Members' Common Injuries*

122. To date, Defendant has done absolutely nothing to compensate Plaintiffs and Class members for the damages they sustained in the Data Breach.

123. Furthermore, Defendant's failure to safeguard Plaintiffs' and Class members' Private Information, places the burden squarely on Plaintiffs and the Class, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts and omissions resulting in the Data Breach.

124. Plaintiffs and Class members have been damaged by the compromise and exfiltration, by cyber-criminals, of their Private Information as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

125. Plaintiffs and Class members were damaged in that their Private Information is now in the hands of cyber criminals being sold and potentially for sale for years into the future.

126. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft, especially in light of the actual fraudulent misuse of the Private Information that has already taken place, as alleged herein.

127. The risk is not hypothetical. Here, a known hacking group intentionally stole the data, misused it, threatened to publish, or has published it on the Dark Web, and the sensitive information, including names and Social Security numbers, is the type that could be used to

perpetrate identity theft or fraud.

128. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been forced to expend time dealing with the effects of the Data Breach.

129. Plaintiffs and Class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, for medical care and services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiffs and Class members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

130. Plaintiffs and Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class members.

131. Plaintiffs and Class members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

132. Plaintiffs and Class members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

133. Plaintiffs and Class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a. Finding fraudulent charges;

b.  Canceling and reissuing credit and debit cards;

c.  Purchasing credit monitoring and identity theft prevention;

d.  Monitoring their medical records for fraudulent charges and data;

e.  Addressing their inability to withdraw funds linked to compromised accounts;

f.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g.  Placing "freezes" and "alerts" with credit reporting agencies;

h.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i.  Contacting financial institutions and closing or modifying financial accounts;

j.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

Moreover, Plaintiffs and Class members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

134.  Further, as a result of Defendant's conduct, Plaintiffs and Class members are forced to live with the anxiety that their Private Information —which contains the most intimate details

about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

135. Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach since January 22, 2026 and failed to notify those affected, including Plaintiff and Class members until June 12, 2026. Defendant offered no explanation of purpose for the delay. This delay violates HIPAA and other notification requirements and increased the injuries to Plaintiffs and Class.

## CLASS ALLEGATIONS

136. Plaintiffs bring this nationwide class action individually and on behalf of all other persons similarly situated (the "Class") pursuant to Federal Rule of Civil Procedure 23(a) and (b).

137. Plaintiffs proposes the following Class definition, subject to amendment based on information obtained through discovery:

**Nationwide Class:**

> All individuals whose Private Information was compromised in the Data Breach beginning on or about January 22, 2026.

138. Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

139. Plaintiffs reserve the right to amend the definition of the Class or add a class or subclass if further information and discovery indicate that the definition of the Class should be

narrowed, expanded, or otherwise modified.

140. Certification of Plaintiffs' claim for class-wide treatment is appropriate because Plaintiffs can prove the elements of Class Members' claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims for each Class Member.

141. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Federal Rule of Civil Procedure 23(a).

142. **Numerosity:** The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Private Information of potentially 1.4 million other of Defendant's patients was compromised in the Data Breach. Such information is readily ascertainable from Defendant's records.

143. **Commonality:** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

   a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

   b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

   c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, the FTC Act and HIPAA;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether hackers obtained Plaintiffs' and Class Members' Private Information in the Data Breach;

f. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

g. Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

h. Whether Defendant breached the covenant of good faith and fair dealing implied in its contracts with Plaintiffs and Class Members; and

i. Whether Plaintiffs and the Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

144. **Typicality:** The claims or defenses of Plaintiffs are typical of the claims or defenses of the proposed Class because Plaintiffs' claims are based upon the same legal theories and same violations of law. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

145. This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Class includes only Defendant's patients, the legal and factual issues are narrow and easily defined, and the Class Membership is limited. The Class does not contain so many persons that would make the Class notice procedures unworkable or overly expensive. The identity of the Class Members can be identified from Defendant's records, such that direct notice to the Class Members would be appropriate.

146. In addition, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

147. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendant failed to timely and adequately notify the public of the Data Breach;

    b. Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c. Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

    d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    e. Whether Defendant failed to take commercially reasonable steps to safeguard patients' Private Information; and

    f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

148. Further, this action satisfies Federal Rule of Civil Procedure 23 (b)(3) because: (i) common questions of law and fact predominate over any individualized questions; (ii) prosecuting individual actions would create a risk of inconsistent or varying adjudications, risking incompatible standards of conduct for Defendant, and a risk adjudications with respect to

34

individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interest; and (iii) the Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

149.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach.

## CAUSES OF ACTION

### COUNT I
### Gross Negligence
(On Behalf of Plaintiffs and Class Members)

150.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

151.    Defendant required Plaintiffs and Class members to submit non-public personal information in order to obtain healthcare/medical services and/or employment.

152.    By collecting and storing this data in Defendant's computer network and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network—and Class members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

153.    Defendant owed a duty of care to Plaintiffs and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the

Private Information.

154. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a Data Breach.

155. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

156. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

157. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

158. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' Private Information by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the Private Information was stored, used,

36

and exchanged, and those in its employ who were responsible for making that happen.

159. The specific reckless and grossly negligent acts and omissions committed by Defendant include, but are not limited to, the following:

 a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

 b. Failing to adequately monitor the security of their networks and systems and to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information; and

 c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards.

 d. Failing to detect the breach at the time it began or within a reasonable time thereafter; and

 e. Failing to follow their own privacy policies and practices published to their employees and residents.

160. Defendant's conduct went far beyond ordinary negligence. Defendant acted with gross negligence by consciously and recklessly disregarding known risks to Plaintiffs' Private Information, including by failing to implement basic and industry-standard cybersecurity measures, failing to adequately monitor its systems for unauthorized access, failing to remediate known security vulnerabilities, failing to properly train employees on data security, and failing to timely detect and prevent the Data Breach. Defendant knew or should have known that its inadequate data-security practices created a high probability of harm to Plaintiff and the Class, yet Defendant consciously failed to take reasonable steps to prevent that harm.

161. Defendant's grossly negligent conduct demonstrated a substantial lack of concern for whether injury would result to Plaintiff and the Class. Defendant's actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiff and the Class, whose sensitive personal and medical information Defendant was entrusted to protect.

162. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

163. It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' Private Information would result in injury to Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

164. It was therefore foreseeable that the failure to adequately safeguard Class members' Private Information would result in one or more types of injuries to Class members.

165. Plaintiffs and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

166. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class members in an unsafe and unsecure manner.

167. Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class members.

## COUNT II
### Breach of Implied Contract
(On Behalf of Plaintiffs and Class Members)

168. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

169. When Plaintiffs and Class members provided their Private Information to Defendant in exchange for Defendant's services, they entered into implied contracts with

Defendant pursuant to which Defendant agreed to reasonably protect such information.

170. Defendant solicited, offered, and invited Class members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class members accepted Defendant's offers and provided their Private Information to Defendant.

171. In entering into such implied contracts, Plaintiffs and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

172. Plaintiffs and Class members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

173. Plaintiffs and Class members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

174. Plaintiffs and Class members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

175. Plaintiffs and Class members fully and adequately performed their obligations under the implied contracts with Defendant.

176. Defendant breached its implied contracts with Class members by failing to safeguard and protect their Private Information.

177. As a direct and proximate result of Defendant's breach of the implied contracts, Class members sustained damages as alleged herein, including the loss of the benefit of the bargain.

178. Plaintiffs and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

179. Plaintiffs and Class members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class members.

## COUNT III
### Unjust Enrichment
(On Behalf of Plaintiffs and Class Members)

180. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

181. Plaintiffs bring this claim individually and on behalf of all Class members.

182. This Claim is pleaded in the alternative to Count II above.

183. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class members.

184. As such, a portion of the payments made by or on behalf of Plaintiffs and the Class members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

185. Plaintiffs and Class members conferred a monetary benefit on Defendant. Specifically, they purchased medical care and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiffs and Class members should have received from Defendant the medical care and services that were the subject of the transaction and have their Private Information protected with adequate data security.

186. Defendant knew that Plaintiffs and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class members for business purposes.

187. In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures. Plaintiffs and Class members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

188. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

189. Defendant failed to secure Plaintiffs' and Class members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class members provided.

190. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

191. If Plaintiffs and Class members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

192. Plaintiffs and Class members have no adequate remedy at law.

193. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class

41

members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members.

194. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm.

195. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class members overpaid for Defendant's services.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

a. For an Order certifying this action as a Class action and appointing Plaintiffs as a Class

Representative and their counsel as Class Counsel;

b. For equitable relief enjoining Xsolis from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class members;

c. For equitable relief compelling Xsolis to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

d. Ordering Xsolis to pay for not less than three years of credit monitoring for Plaintiffs and the Class;

e. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

f. For an award of punitive damages, as allowable by law;

g. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h. Pre-and post-judgment interest on any amounts awarded; and,

i. Such other and further relief as this court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: June 30, 2026

Respectfully submitted,

*/s/ Grayson Wells*
J. Gerard Stranch, IV (TN BPR 230450
Grayson Wells (TN BPR 039658)
John C. Roberts (TN BPR 042673)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center

43

223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gwells@stranchlaw.com
jroberts@stranchlaw.com

Marc H. Edelson*
Liberato P. Verderame*
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
T: (215) 867-2399
medelson@edelson-law.com
lverderame@edelson-law.com

***\*Pro hac vice forthcoming***

***Attorneys for Plaintiffs and the Proposed Class***

44